[Civ. No. 26403.   Second Dist., Div. One.   Nov. 2, 1962.]

TOM E. NORCROSS, Plaintiff and Respondent, v. R. W. WINTERS, Defendant and Appellant.

_____

*Assigned by Chairman of Judicial Council.

Robert M. Devitt and John Walter Norby for Defendant and Appellant.

Kirkpatrick & Kirkpatrick and Eugene R. Kirkpatrick for Plaintiff and Respondent.

FOURT, J.—Defendant subcontractor appeals from a judgment rendered in favor of plaintiff contractor after a trial by the court sitting without a jury. Plaintiff's action for damages was predicated upon defendant's failure to honor his bid to perform certain subcontracting work consisting of the furnishing and installation of chalk and tack boards for the Department of Public Works of the State of California at the agreed price.

Viewing the evidence in the light most favorable to the prevailing party, a résumé of the facts is as follows:

On April 1, 1959, the Department of Public Works of the State of California solicited bids for a construction job known as the Industrial Arts Building of Long Beach State College, Long Beach, California· (hereinafter referred to as "job"). The time set for submission of bids was 2 p. m., April 1, 1959. Plaintiff, a general contractor, duly licensed under the laws of the State of California, was a bidder for the job.

For some time prior to the submission date plaintiff had solicited bids from various subcontractors for various phases of the work, to be incorporated into plaintiff's bid for the job.

On April 1, 1959, sometime prior to the time for submission of bids for the job, defendant telephoned to plaintiff a bid to perform, furnish and install the chalk and tack boards in accordance with the plans and specifications for the sum of $4,800. The bid was clear and definite, and there were no exclusions or qualifications. A written memorandum made by plaintiff's employee of defendant's oral bid was introduced in evidence (Plaintiff's Exhibit 16).

Defendant's bid of $4,800 for the chalk and tack board was low, and was used by plaintiff in computing, preparing and submitting its bids for the job. Plaintiff's bid was low and he was awarded the general contract for the job. The general contract called for a completion date of July 1, 1960, and con-

tained a liquidated damage clause in the amount of $200 per day if completion was not made on that date.

In the joint pretrial statement which was attached to and incorporated into the pretrial order it was agreed between the parties that ''6. Plaintiff made demand upon defendant that he perform, furnish, install all chalk, tack and bulletin boards in accordance with the plans and specifications in accordance with said bid and verbal promise of defendant. 7. Defendant did not perform, furnish and install said chalk, tack and bulletin boards upon said construction project.''

The trial court did not make any express finding relating to communication.[1] During the argument on defendant's motion for a new trial the trial judge commented on what he termed ''a fantastic lack of communication on both sides.'' The reporter's transcript discloses the following in pertinent part:

''THE COURT: I don't think that the question of communication is vital under the *Drennan* case [i.e. *Drennan* v. *Star Paving Co.*, 51 Cal.2d 409 [333 P.2d 757]], and I think this present case is as nearly on all fours with the *Drennan* case as you ever get. . . .

''I mentioned the fantastic lack of communication. If we are to apportion blame here, the subcontractor [i.e., defendant] shows a fantastic lack of tending to business. He didn't return calls and certainly he got some of these letters. It can't be that all of these letters were misdirected and it is inferrable in this case that he was dodging being held to the bid that he made, but I don't think it is necessary for the Court to determine that.''

Although the trial court failed to make any express finding on communication there was much evidence introduced relating to communication by plaintiff. Plaintiff's evidence disclosed the following:

1. Mr. Lawrence H. Frembling, plaintiff's office manager and chief estimator, testified as follows in pertinent part:

''Q. Subsequent to the submission of the bid was your bid accepted and was the contract issued and awarded by the Department of Public Works? A. Yes, it was.

''Q. Would you state to the Court after you were awarded

---

[1]One of defendant's contentions on this appeal is that the doctrine of promissory estoppel is not applicable unless the general contractor notifies or communicates with the subcontractor upon the general contractor receiving notice that he was awarded the general bid. This contention will be discussed *infra*.

the bid the extent and nature of the communication with . . . [defendant] ?

"        .    .    .    .    .    .    .    .    .    .    .

"Q. Did you prepare and submit a contract to the . . . [defendant] ? A. Yes, I did, on our standard sub form.

"Q. When did you do that? A. I believe the date on it would be April 28th.

"        .    .    .    .    .    .    .    .    .    .    .

"Q. By Mr. KIRKPATRICK: I direct your attention to Standard form transmittal letter dated April 28, 1959, indicating a transmittal of a contract. A. Yes, that is correct.

"Q. Was this the document that you were talking about that was mailed out on April 28th? A. That is correct.

"        .    .    .    .    .    .    .    .    .    .    .

"THE COURT: It may be received as Plaintiff's Exhibit 1.

"Q. By Mr. KIRKPATRICK: I show you what is labeled Tom E. Norcross standard form contract, and it has filled in the date April 27, 1959, and the name . . . [defendant]. Is this a copy of the standard form contract that was transmitted with the letter? A. It is.

"        .    .    .    .    .    .    .    .    .    .    .

"THE COURT: It may be received as Plaintiff's Exhibit No. 2."

During the cross-examination of Mr. Frembling, the record discloses the following in pertinent part:

"Q. With reference to Exhibits 1 and 2, which are copies— at least a carbon copy of a transmittal letter dated April 28, 1959—— A. Yes.

"Q. —and a copy of a contract dated April 27, 1959, where did you get those copies to bring them into court?

"        .    .    .    .    .    .    .    .    .    .    .

"A. Out of my file.

"Q. Do you have anything to do with the preparation of the transmittal letter or the subcontract? A. Yes, I do.

"Q. What do you have to do with it? A. Well, I personally handwrote the subcontract for the typist to type up.

"Q. In this instance? A. Yes. I instructed her to send it, accompanied by a transmittal, this letter, instructing the particular subcontractor what to do. We were submitting it for his signature and to return the two copies.

"        .    .    .    .    .    .    .    .    .    .    .

"Q. Do you know from your own knowledge whether or not either of those were sent to Mr. Winters? A. Yes, I do.

"Q. How do you know it? A. The copies, once they were

rendered, I signed the original of this and then directed her to mail it.

"   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Isn't it an assumption that this is the usual procedure? A. This is the procedure and it has been followed faithfully for years.

"Q. That is the basis from which you are testifying, you can honestly say? A. Yes, I can.

"Q. And you don't have an independent recollection, then, do you? A. From April 28, 1959?

"Q. Yes. A. I made no mark on here that I saw or looked at it.

"Q. The question is: You have no independent recollection? A. All right, I don't."

2. Mrs. Beverly Jean Bailey, who had been an employee of plaintiff, testified concerning her attempts to reach defendant by telephone. The reporter's transcript discloses the following in part:

"Q. Mrs. Bailey, in your capacity as an employee for . . . [plaintiff], did you have occasion to attempt to reach Mr. Winters on the telephone? A. Yes, I did.

"Q. When did this occasion occur? A. It was sometime in July, August, and September.

"Q. On how many occasions did you attempt to reach Mr. Winters by telephone? A. Well, generally speaking, I would say on the average possibly three or four times a day, and three or four days out of the week. Every spare moment that I had I would dial the number.

"Q. Were you able to reach Mr. Winters on any of those occasions? A. No.

"Q. Was the line busy or was there just no answer? A. Most of the time it was busy. It did ring a few times, but there was no answer.

"Q. Now, later on during this period was there a telephone answering service? A. Yes.

"Q. During what portion of this period was the telephone answered by the answering service? A. Well, it was somewhere around the end of August or in September. I don't remember the exact date.

"Q. And after the telephone answering service was installed, on how many occasions would you say you called the . . . [defendant]? A. I would say at least six or seven messages, if not more.

"Q. Were any of them returned? A. No."

3. Mr. Frembling testified that the next written communication between plaintiff and defendant was by a letter dated October 7, 1959 (plaintiff's Exhibit 3). Defendant on direct examination admitted receipt of the letter (plaintiff's Exhibit 3). He testified that this was the first communication that he had with respect to the matter of this particular job. Defendant further admitted that between April and October he had received notification ("probably six times") that plaintiff had called but asserted that none of the messages was to the effect that defendant's bid had been accepted. Defendant further testified that he did telephone plaintiff approximately five times between April 1, 1959, and October 7, 1959, but never spoke to "anybody of responsibility."

4. On October 13, 1959, plaintiff again wrote defendant advising defendant that numerous requests from the Department of Public Works of the State of California had been received for the shop drawings and material samples required by the plans and specifications, and requesting that defendant contact plaintiff immediately. Plaintiff's Exhibit 4 was a copy of the correspondence dated October 13, 1959. Plaintiff's Exhibit 5 was the envelope and the original of the letter dated October 13, 1959, which had been sent by registered mail but had been returned to plaintiff on or about October 27, 1959, unopened and unclaimed.

5. Mr. Frembling testified that on November 19, 1959, plaintiff contacted the State of California Contractors License Board and that on November 20, 1959, plaintiff received a call from defendant, at which time defendant stated that Mr. Houser of the license board had contacted him (defendant) with regard to plaintiff's call. Mr. Frembling testified as to the substance of the telephone conversation as follows:

"A. One of the main points was that I had asked Mr. Winters if he would send shop drawings and material samples to us. I asked him about signing and returning the subcontract form which had been submitted to him for signature. He advised me that he needed the plans and specifications to be able to render shop drawings and submit samples. I agreed with him and advised him that a set of plans and specifications were available to him, and he advised me that he would be by on Monday—November 20th was on a Friday, as I recall, and he would be by Monday and pick them up. However, he did not come by the following Monday. In fact, to the best of my knowledge, Mr. Winters has never been in the office of Tom E. Norcross."

Defendant testified concerning the telephone conversation of November 20, 1959, as follows:

"A. Well, I then advised him we still did not have a contract, that there were—I agreed that there were shop drawings that he would probably need, but that we would have to have the blueprints and specifications, and to start with we should have a contract in writing to proceed.

"Q. What did he say? A. The conversation was on this line and then he agreed to meet with me the following Monday, which was November 23rd."

As correctly stated in defendant's brief, "The parties never did get together on November 23, and there is a conflict of testimony as to the reason for this."

It would serve no useful purpose to set forth further the evidence relating to additional attempts at communication. Suffice it to say, in the words of the defendant, "Thereafter, there were further attempts at communication and then the Plaintiff requested approval of a change of subcontractors from the State."[2]

The Department of Public Works approved the substitution on February 5, 1960, and advised plaintiff of such approval on February 10, 1960. Ultimately, plaintiff performed the work himself.

On September 22, 1960, plaintiff filed a complaint wherein damages were sought in the amount of $9,105.49, ". . . the difference between the cost to plaintiff of obtaining said chalk, tack and bulletin boards in the amount of . . . ($13,905.49) and the verbal promise and bid of defendant to furnish and install said chalk, tack and bulletin boards in the amount of . . . $4800.00) ; . . ."

[2]Government Code section 4104 provides as follows:

"No general contractor whose bid is accepted shall, without the consent of the awarding authority, either:

"(a) Substitute any person as subcontractor in place of the subcontractor designated in the original bid.

"(b) Permit any such subcontract to be assigned or transferred or allow it to be performed by anyone other than the original subcontractor listed in the bid.

"(c) Sublet or subcontract any portion of the work in excess of one-half (½) of one percent (1%) of the general contractor's total bid as to which his original bid did not designate a subcontractor.

"(d) The awarding authority may consent to the substitution of another person as a subcontractor, when the subcontractor named in the bid after having had a reasonable opportunity to do so, fails or refuses to execute a written contract, when said written contract, based upon the general terms, conditions, plans and specifications for the project involved, or the terms of such subcontractor's written bid, is presented to him by the contractor."

On October 31, 1961, the findings of fact and conclusions of law were filed.[3] Judgment was entered November 2, 1961, and provides in part as follows:

"It Is Ordered, Adjudged and Decreed:

"I

"That plaintiff . . . have judgment against the defendant . . . in the sum of ($8,392.01), together with his costs of suit incurred herein in the sum of . . . ($32.25).

---

[3]The findings of fact and conclusions of law provide in pertinent part as follows:

"Findings of Fact

"III

"That plaintiff as such general contractor was, on April 1, 1959, engaged in business as such general contractor and bidding for a construction job known as the Industrial Arts Building, Long Beach State College, Long Beach, California, for the Department of Public Works of the State of California, which bid, in accordance with the bidding instructions, had to be submitted in writing to the said Department of Public Works of the State of California in Los Angeles, California, not later than 2:00 o'clock P.M. on said April 1, 1959.

"IV

"That plaintiff did submit a bid to the Department . . .; that said bid was accepted and approved by the Department . . .; that, pursuant thereto, plaintiff entered into a construction contract as prime contractor, with the Department. . . .

"V

"That, prior to submission of plaintiff's bid for the construction of said Industrial Arts Building, to wit, on said April 1, 1959, between the hours of 10:30 A.M. and 12:00 noon, plaintiff received from defendant at his office at 6053 Atlantic Avenue, Long Beach, California, a verbal promise that defendant would perform, furnish and install all of the chalk and tack boards, in accordance with plans and specifications for said Industrial Arts Building . . . for the sum of . . . ($4,800.00).

"VI

"That in making said verbal promise, defendant stated to plaintiff's authorized agent, Beverly Baily [sic], that he was submitting a bid for chalk and tack boards for the sum of $4,800.00, in accordance with the plans and specifications, tax included, installed; that no exclusions from said work were mentioned or specified.

"VII

"That plaintiff relied upon said verbal promise of defendant and used the said bid of defendant for chalk and tack boards in computing his said bid for submission to the Department . . . and did, in submitting his said bid, name defendant as the subcontractor to perform, furnish and install the chalk and tack boards in connection with the construction of said Industrial Arts Building. . . .

"VIII

"That plaintiff acted reasonably in relying upon the bid for chalk, and tack boards by defendant, as aforesaid.

"IX

"That in submitting said bid to plaintiff, defendant knew that plaintiff was preparing and submitting a bid to the Department . . .; that

## "II

"That all relief prayed for by said defendant herein is hereby denied."

Defendant's motion for a new trial was denied on November 28, 1961, and this appeal followed.

Defendant's first contention is that the doctrine of promissory estoppel (hereinafter sometimes referred to as "doctrine") is not applicable to the case at bar. Defendant advances several arguments in support of this contention.

In *Drennan* v. *Star Paving Co.*, 51 Cal.2d 409, 413 [333

defendant reasonably expected that his said bid for chalk and tack boards would induce plaintiff to submit his said bid to the Department . . . based thereon.

### "X

"That, although requests and demands were made by plaintiff upon defendant to perform, furnish and install chalk and tack boards for the sum of $4,800.00, defendant failed, refused and neglected to perform, furnish and install the said chalk and tack boards in accordance with the said promise of defendant.

### "XI

"That in order to fulfill his commitments pursuant to his contract with the Department . . . for the construction of said Industrial Arts Building, plaintiff was compelled to make other arrangements for the furnishing and installation of said chalk and tack boards. That plaintiff made reasonable efforts, over a period of more than two months, to negotiate a contract with other chalk and tack board subcontractors, including those that had originally submitted bids upon said Industrial Arts Building, but was unsuccessful in negotiating a firm contract therefor within the period required under his said contract with the Department . . .; that plaintiff thereupon arranged directly for the materials and labor necessary to fabricate, furnish and install the chalk and tack boards.

### "XII

"That in arranging directly for the materials and labor necessary to fabricate, furnish and install said chalk and tack boards as aforesaid, plaintiff acted reasonably and exercised reasonable care and diligence.

### "XIII

"That the actual cost to plaintiff of fabricating, furnishing and installing the chalk and tack boards in accordance with the plans and specifications of the Department . . . was . . . ($13,192.01).

### "XIV

"That plaintiff has been damaged in the sum of . . . ($8,392.01).

### "XV

"That injustice can be avoided only by the enforcement of defendant's promise to perform, furnish and install the chalk and tack boards in accordance with his said promise.

### "XVI

"That the chalk and tack boards, the subject of defendant's bid and promise, were to be manufactured, fabricated and fashioned according to specifications provided by the Department . . . and were required to be cut in particular sizes, shapes and dimensions as is specified in the

P.2d 757] a statement of the doctrine is set forth in pertinent part as follows:

"[1] Section 90 of the Restatement of Contracts states: 'A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.' This rule applies in this state. (*Edmonds* v. *County of Los Angeles,* 40 Cal.2d 642 [255 P.2d 772]; *Frebank Co.* v. *White,* 152 Cal.App.2d 522 [313 P.2d 633]; *Wade* v. *Markwell & Co.,* 118 Cal.App.2d 410 [258 P.2d 497, 37 A.L.R.2d 1363]; *West* v. *Hunt Foods, Inc.,* 101 Cal.App.2d 597 [225 P.2d 978]; *Hunter* v. *Sparling,* 87 Cal.

---

plans and specifications, and were required to be installed in accordance with the plans and specifications.

"XVII

"That all of the allegations of defendant inconsistent with the foregoing findings are untrue.

"CONCLUSIONS OF LAW

"I

"That defendant made a verbal bid and promise to plaintiff to perform, furnish and install all chalk and tack boards in accordance with the plans and specifications prepared by the Department . . . for the sum of . . . ($4,800.00).

"II

"That defendant should have reasonably expected that his said bid and promise would induce the plaintiff to submit a bid based thereon to the Department . . . and that such promise did induce this action, and that injustice can be avoided only by enforcement of the promise.

"III

"That plaintiff reasonably relied upon the bid and promise of defendant.

"IV

"That by its bid defendant induced action by plaintiff of a definite and substantial character, to plaintiff's detriment and prejudice.

"V

"That under all of the facts and circumstances of this case, defendant is estopped, by virtue of the doctrine of promissory estoppel, from revoking, denying or repudiating his agreement to perform, furnish and install all of the chalk and tack boards in accordance with plans and specifications of the Department . . . for the sum of $4,800.00.

"VI

"That the promise and agreement upon which this action is based is not barred or invalid by the Statute of Limitations or the provisions of Section 1724 of the Civil Code of California.

"VII

"That plaintiff is entitled to judgment against defendant in the sum of . . . ($8,392.01), together with his costs of suit incurred herein."

App.2d 711 [197 P.2d 807]; see 18 Cal.Jur.2d 407-408; 5 Stan L. Rev. 783.)"

Defendant first asserts that in order for the doctrine to be applicable, it is necessary for the general contractor to notify or communicate with the subcontractor upon the general contractor's receiving notice that he (general contractor) was awarded the general contract. (See footnote 1.)

The mere fact that a general contractor uses a subcontractor's bid as part of the general contractor's overall bid does not thereby create a contract between the general contractor and the subcontractor. It is stated by Mr. Justice Peters in *Klose* v. *Sequoia Union High School Dist.*, 118 Cal.App.2d 636 [258 P.2d 515] at pages 640-641, as follows in pertinent part:

" [2] Petitioner's arguments are necessarily predicated upon the concept that a subcontractor, whose name is submitted with the bid of the general contractor, in some undefined way, secures some legal rights when the general contractor's bid is accepted by the awarding authority. In the absence of statute that is not the law. A subcontractor bidder merely makes an offer that is converted into a contract by a regularly communicated acceptance conveyed to him by the general contractor. *No contractual relationship is created between the subcontractor and the general contractor even though the bid is used as part of the general overall bid by the general contractor and accepted by the awarding authority.* (*Williams* v. *Favret*, 161 F.2d 822; 1 Corbin on Contracts, p. 58, § 24, particularly cases cited in fn. 11 on p. 59.)" (Emphasis added.)

Therefore, while the use of a subcontractor's bid by the general contractor does not ipso facto create a contract between the general contractor and the subcontractor (i.e., does not constitute an implied acceptance of the subcontractor's offer), it does, as illustrated by *Drennan* v. *Star Paving Co.*, 51 Cal.2d 409 [333 P.2d 757] make the subcontractor's bid (offer) irrevocable.

This distinction between "irrevocable offer" and "acceptance" is illustrated by what is stated in the *Drennan* case at page 415:

" [5] When plaintiff [i.e., general contractor] used defendant's [*i.e.*, subcontractor] offer in computing his own bid, he bound himself to perform in reliance on defendant's terms. Though defendant did not bargain for this use of its bid neither did defendant make it idly, indifferent to whether it

would be used or not. On the contrary it is reasonable to suppose that defendant submitted its bid to obtain the subcontract. It was bound to realize the substantial possibility that its bid would be the lowest, and that it would be included by plaintiff in his bid. It was to its own interest that the contractor be awarded the general contract; the lower the subcontract bid, the lower the general contractor's bid was likely to be and the greater its chance of acceptance and hence the greater defendant's chance of getting the paving subcontract. Defendant had reason not only to expect plaintiff to rely on its bid but to want him to. Clearly defendant had a stake in plaintiff's reliance on its bid. Given this interest and the fact that plaintiff is bound by his own bid, *it is only fair that plaintiff should have at least an opportunity to accept defendant's bid after the general contract has been awarded to him.*

"[6] It bears noting that *a general contractor is not free to delay acceptance after he has been awarded the general contract in the hope of getting a better price. Nor can he reopen bargaining with the subcontractor and at the same time claim a continuing right to accept the original offer.*" (Emphasis added.)

Implicit in the above dictum (headnote 6 of the *Drennan* case) is recognition that the ''irrevocable offer'' which comes into existence through the operation of the doctrine does not mean irrevocable in perpetuity. The rationale for holding the offer to be irrevocable is to allow the general contractor an ''opportunity to accept defendant's bid after the general contract has been awarded to him.'' Or, as stated at page 414:

"[3] . . . [T]he subsidiary promise [i.e., not to revoke] serves to preclude the injustice that would result if the offer could be revoked after the offeree had acted in detrimental reliance thereon."

Defendant's failure to distinguish between the ''irrevocable offer'' which comes into existence through the operation of the doctrine of promissory estoppel, and manifestation of assent to create the bilateral contract (communication of acceptance of the offer) is disclosed by his statement that, ''If the Court were to hold now that communication is not necessary to the *formation of a contract,* then the rationale of the law review article [i.e., 47 Cal.L.Rev. 405] would apply in full force as the countractor [*sic*] would be allowed to speculate on the damages allegedly attributable to the Defendant.'' (Emphasis added.)

There is nothing appearing in the case at bar which would support a conclusion that plaintiff delayed acceptance in the

hope of getting a better price or that he reopened bargaining with defendant while claiming, at the same time, a continuing right to accept the original offer.

Where the elements of Restatement of Contracts, section 90, are satisfied, the doctrine makes defendant subcontractor's offer (bid) irrevocable without the necessity of the general contractor notifying defendant that he (general contractor) has been awarded the general contract.

Defendant's next argument in support of his contention that the doctrine is not applicable is that plaintiff could not reasonably rely upon defendant's bid.

The trial court found (findings VII and VIII—footnote 3) that plaintiff relied upon defendant's bid and "acted reasonably in relying upon the bid."

The thrust of defendant's argument is that "there is a substantial discrepance [sic] between the $4,800.00 bid [i.e., defendant's bid] and the other two bids in the amount of $7,990.99 and $8,145.00."

The reporter's transcript discloses the following which occurred during the cross-examination of Mr. Frembling by defense counsel:

"Q. By MR. DEVITT: Did the discrepancy between the $4,800 as opposed to $7,990 . . . and the $8,100—I believe Mr. Kirkpatrick [i.e., plaintiff's attorney] asked whether there was anything to occasion you to wonder whether a mistake might have been made—wouldn't the discrepancy in the figures raise any question in your mind that it is substantially lower?

"A. There is no indication here which bid came in first. These bids come in as late as within seconds of bid time. I cannot testify when any one of these three bids came in, and therefore I cannot tell you how much time I had to analyze this particular item. However, we will say that Mr. R. W. Winters has apparently, over the years, been a reputable concern and I had no question or reason to question his bid.

"Q. The figures themselves would not occasion you to wonder whether there was any need for clarification, would they? A. Not necessarily.

"Q. Would that be a sharp difference in price? A. No, not necessarily.

"Q. As I see it, I believe these other two bids are probably about 80 per cent higher. A. Well, $8,100 as against——

"THE COURT: That is a mathematical computation.

"Q. By MR. DEVITT: But this difference in no way prompted you to wonder? A. No, I would have to take other cases as an

example and attempt to prove it to you that the difference there would not cause concern.''

There is substantial evidence to support the trial court's findings. We cannot hold as a matter of law that plaintiff had reason to know that defendant had made a mistake in submitting his bid. It is stated in the *Drennan* case, 51 Cal.2d at page 416:

"[7] Of course, if plaintiff had reason to believe that defendant's bid was in error, he could not justifiably rely on it, and section 90 would afford no basis for enforcing it. [Citation.] Plaintiff, however, had no reason to know that defendant had made a mistake in submitting its bid, since there was usually a variance of 160 per cent between the highest and lowest bids . . . He committed himself to performing the main contract in reliance on defendant's figures. Under these circumstances defendant's mistake, far from relieving it of its obligation, constitutes an additional reason for enforcing it, for it misled plaintiff as to the cost. . . . [8] As between the subcontractor who made the bid and the general contractor who reasonably relied on it, the loss resulting from the mistake should fall on the party who caused it.''

Defendant's next contention is that the evidence is insufficient to support finding of fact X (footnote 3) which provides:

"X

''That, although requests and demands were made by plaintiff upon defendant to perform, furnish and install chalk and tack boards for the sum of $4,800.00, defendant failed, refused and neglected to perform, furnish and install the said chalk and tack boards in accordance with the said promise of defendant.''

This contention is so totally devoid of merit as to hardly warrant consideration by this court.

As set forth in the statement of facts it was stipulated by the parties in their pretrial statement that ''6. Plaintiff made demand upon defendant that he perform, furnish, install all chalk, tack and bulletin boards in accordance with the plans and specifications in accordance with said bid and verbal promise of defendant. 7. Defendant did not perform, furnish and install said chalk, tack and bulletin boards upon said construction project.''

In addition, a reading of the record confirms the trial court's apt observation (made during defendant's argument on a

motion for new trial), "It can't be that all of these letters were misdirected and it is inferrable in this case that he [i.e., defendant] was dodging being held to the bid that he made." Defendant's statement in his opening brief that the evidence shows that he was "anxious to create and perform a contract" is hardly sustainable by the record.

Defendant's next contention apparently is that he was not under any obligation to perform the terms of his promise (offer) because "the parties never intended a contract to be formed until such time as a written document was signed by both parties."

The gist of this contention is that since plaintiff submitted a written subcontract to defendant for his signature, and since defendant failed to execute said written contract, "the relationship between the parties . . . [is merely] one of mutual intent to enter into a written contract."

Perhaps this argument stems from defendant's failure to make a proper analysis of the effect of the doctrine of promissory estoppel. Once defendant's offer became irrevocable, he was in no position to refuse to perform according to his bid when plaintiff manifested assent to accept the offer.

The defendant's bid was clear and explicit without qualification. Plaintiff's conduct in the case at bar was for the purpose of getting defendant to execute a confirming contract or otherwise to confirm that he (defendant) was going to do the chalk and tack board work in accordance with his bid, and getting defendant to submit the shop drawings and material samples, and proceed with the work, all as required by the plans and specifications in accordance with his bid.

Defendant could not, by the simple expedient of refusing to execute the written subcontract, thereby insulate himself from his obligation to perform according to the terms of his offer. To hold otherwise would render nugatory the effect of the doctrine of promissory estoppel which makes defendant's offer to perform irrevocable.

Lastly, defendant asserts that the trial court erred in the amount of the award of damages.

The trial court found (finding XIII—footnote 3) that "the actual cost to plaintiff of fabricating, furnishing and installing the chalk and tack boards in accordance with the plans and specifications of the Department . . . was . . . ($13,192.01)" and awarded plaintiff damages in the amount of $8,392.01, said sum representing the difference between defendant's bid

($4,800), and the amount of the actual cost to plaintiff for performance of the job.

In addition the court found (findings XI and XII—footnote 3) that "in order to fulfill his commitments pursuant to his contract with the Department . . . plaintiff was compelled to make other arrangements for the furnishing and installation of said chalk and tack boards. *That plaintiff made reasonable efforts, over a period of more than two months, to negotiate a contract with other chalk and tack board subcontractors, including those that had originally submitted bids upon said Industrial Arts Building, but was unsuccessful in negotiating a firm contract therefor within the period required under his said contract with the Department . . .; that plaintiff thereupon arranged directly for the materials and labor necessary to fabricate, furnish and install the chalk and tack boards."* And, that *"in arranging directly for the materials and labor necessary to fabricate, furnish and install said chalk and tack boards as aforesaid, plaintiff acted reasonably and exercised reasonable care and diligence."* (Emphasis added.)

Defendant does not question the sufficiency of the evidence to support the finding (finding XIII) that the actual cost to plaintiff in his performance of the job was $13,192.01. However, defendant does take the position "that the cost of completing the work is unreasonable."

The crux of defendant's argument is that it was unreasonable for plaintiff to perform the work himself; that it was incumbent upon plaintiff to accept the next lowest bid (*i.e.,* the bid of Educational Equipment Company in the amount of $7,990) ; and that therefore the maximum allowable damages are in the amount of $3,190, computed by deducting defendant's bid of $4,800 from the Educational Equipment Company's bid in the amount of $7,990.

Defendant's position must of necessity be predicated upon the assumption that the Educational Equipment Company's bid, which originally was submitted by that company on or about April 1, 1959 (i.e., Educational Equipment Company was one of the three subcontractors who originally submitted bids for the job), was still open for acceptance by plaintiff subsequent to February 10, 1960.[4]

---

[4] It was not until the Department of Public Works consented to a substitution, based upon Government Code section 4104, subdivision (d) on February 5, 1960 (communicated to plaintiff on February 10, 1960), that plaintiff was in a position to make arrangements with other subcontractors.

The above necessary assumption is directly contrary to finding of fact XI, *supra*, (footnote 3), that "plaintiff made reasonable efforts, over a period of more than two months, to negotiate a contract with other chalk and tack board subcontractors, including those that had originally submitted bids . . . but was unsuccessful in negotiating a firm contract therefor. . . ."

Therefore, although defendant does not couch his argument in the form of an attack upon the sufficiency of the evidence to support the above finding of fact, of necessity, the question of sufficiency of the evidence is vital to defendant's contention.

Viewing the evidence in the light most favorable to the prevailing party and disregarding all conflicts it would appear that there was substantial evidence to support the trial court's determination.

During direct examination of Mr. Frembling the reporter's transcript discloses the following in pertinent part:

"Q. Was the . . . [plaintiff] ever able to get a definite commitment from any of these subcontractors at any price for proceeding with this chalk, tack, and bulletin board work?

"A. No, we were not. We were not able to get a firm commitment or a written commitment. I did not specifically request a written commitment, because there seemed to be no cause or need. There seemed to be a particular lack of interest. I had realized that the time was going by and everything was becoming more urgent, and I saw definitely the need to take some action on this work. . . ."

For the reasons stated, the judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied November 21, 1962.