**JANKE CONSTRUCTION COMPANY, INC., Plaintiff-Appellee,**

v.

**VULCAN MATERIALS COMPANY, Defendant-Appellant.**

No. 75–1120.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 12, 1975.

Decided Jan. 6, 1976.

---

John W. Kelley, Wausau, Wis., for plaintiff-appellee.

Before STEVENS, Circuit Justice,* PELL, Circuit Judge, and PERRY, Senior District Judge.**

PERRY, Senior District Judge.

This is an appeal from a judgment of the District Court in favor of the plaintiff below, Janke Construction Company, Inc. (hereinafter "Janke"), in an action for damages resulting from the failure of defendant below, Vulcan Materials Company (hereinafter "Vulcan"), to provide Janke with appropriate subaqueous pipe and fittings for a marine construction project upon which Janke was the successful bidder. The complaint alleged that prior to March 10, 1970 Janke received an invitation to submit a sealed bid at 2:00 P.M. that date for State Bureau of Engineering Project No. 6512–38 on behalf of the Regents of the University of Wisconsin for marine construction work in accordance with printed drawings, specifications and other contract documents; that prior to and on the aforesaid date Vulcan studied the requirements of the project and agreed to provide Janke, on a per unit cost, with pipe and fittings for water transmission lines required for the project for $149,-754.10; that prior to and on the aforesaid date Vulcan expressly warranted and represented to Janke that Vulcan's products would meet the specifications required for the project; that in reliance thereon Janke used Vulcan's quoted prices in bidding on the marine part of the project and was awarded the contract; that, following the award, Vulcan's products were not approved by the project engineers because they did not meet specifications; and that Janke was thereby forced to purchase specifications-meeting pipe and fittings from another pipe manufacturer, at an additional cost of $39,992.40.

Claude J. Covelli, Madison, Wis., for defendant-appellant.

On August 1, 1974, the action was tried to the District Court without a

* Mr. Justice Stevens participated initially as Circuit Judge, and on and after December 19, 1975 as Circuit Justice.

** Senior District Judge Joseph Sam Perry of the Northern District of Illinois is sitting by designation.

jury. After hearing all the evidence, the court granted Vulcan's motion that post-trial briefs be submitted by the litigants prior to the decision of the court.

In an Opinion and Order entered on October 21, 1974, the District Court, finding Vulcan liable on the grounds of promissory estoppel, ordered judgment entered in favor of Janke in the amount of $39,942.40 [sic] plus costs. The court found that the facts which Janke pleaded and relied upon to support its claim and to which Vulcan responded in entering its defense, gave rise to the application of the doctrine of promissory estoppel as expressed in Section 90 of the Restatement of the Law of Contracts. The court found that Janke had established that Vulcan had made a definite promise with the reasonable expectation that its promise would induce action of a definite and substantial character on Janke's part; that Janke had acted in justifiable reliance upon the promise to Janke's detriment; and that injustice could be avoided only by enforcement of the promise.

On October 31, 1974, Vulcan filed a motion to alter or amend judgment, or in the alternative for a new trial. The District Court denied the motion in an order entered December 6, 1974. On December 27, 1974, Vulcan appealed from the judgment entered against it, and from the order denying Vulcan's post-judgment motion.

The facts, as found by the District Court, are as follows:

Janke, a Wisconsin corporation with its principal offices near Wausau, Wisconsin, had been engaged in various types of construction work, including highway, sewer, airport and marine projects. Vulcan, a New Jersey corporation, operates quarries and has sand, gravel, aggregate and redi-mix concrete plants in several states. In 1970, it also operated a concrete-pipe manufacturing plant located in Illinois.

In February 1970, the State Bureau of Engineering, on behalf of the Regents of the University of Wisconsin, publicly invited submission of sealed bids for the construction of condenser water transmission lines, lake piping and a pumping station for the University of Wisconsin—Milwaukee campus. The project was intended to provide the University with its own cooling system. The bids were to be opened at 2:00 P.M., on March 10, 1970, in Madison, Wisconsin.

The general construction, land, marine and electrical work portions of the project were to be bid on separately, each portion requiring a separate lump sum bid. The marine portion of the work included the furnishing and installation of water intake and return lines into Lake Michigan. The materials required for marine piping included concrete subaqueous pipe in full compliance with either AWWA Specification C300 or AWWA Specification C301. The main contract also contained an "or equal" clause, permitting use of non-specified materials of equal quality to those specified if they were considered equally acceptable to and approved by the project engineers.

Janke, intending to bid on the marine work, obtained price quotations from suppliers of the various materials required for that portion of the project. On March 5, 1970, Jerry Janke, then vice president of Janke, received price quotations by telephone from a Vulcan representative for the various concrete pipe items to be used in the marine work. Janke made a memorandum of the prices quoted, but did not inquire during this conversation whether Vulcan proposed to supply C300 or C301 pipe, nor did the caller specify the quality or type of pipe Vulcan intended to furnish. Vulcan's quoted prices were $40,000 below prices quoted by Interpace, another subaqueous concrete pipe supplier.

On the evening of March 9, 1970, Jerry Janke and his brother, James Janke, owner of Janke, checked in at a Madison hotel for the purpose of submitting their bid the next day. Around midnight they were visited in their hotel room by Alex Barry, then general manager of Vulcan's Wisconsin operations, and Peter W. Fox, a salesman for Vulcan's sand, gravel, crushed limestone and redi-mix concrete.

While it is not clear whether the visit was only social or included some discussion of Vulcan's ability to furnish the pipe for the project, all parties present at the visit agreed that there was no reference to the particular specifications or type of pipe that Vulcan proposed to supply. The next day, shortly prior to submitting his bid, James Janke met Mr. Barry in the hallway of the State Office Building. James Janke testified that he was concerned because of the disparity in the prices quoted by Vulcan and Interpace. He requested and received assurance from Mr. Barry that Vulcan could furnish the pipe for the project. During that meeting Mr. Barry also placed a telephone call to someone at Vulcan who confirmed his assurance.

According to Mr. Barry, Mr. Janke merely inquired at this meeting whether Vulcan could reduce its quoted prices on the pipe, and his telephone call to Vulcan's vice president was made only to confirm his statement that prices would not be reduced.

Mr. Janke, who had relied upon Vulcan's quoted pipe prices in calculating his prime bid, thereupon submitted the bid and was subsequently awarded the contract.

Within the week after the bid opening, Janke received a written quotation from Vulcan setting forth the same prices that were quoted to Jerry Janke over the telephone on March 5th, but stating that the quotation was for AWWA C302 pipe. The writing was dated March 6th, but it is not known when it was mailed.

The record does not indicate the date when Janke discovered that Vulcan was offering to supply C302 pipe and not the pipe listed in the specifications. Between March 10th and March 23rd, however, James Janke met three times in Milwaukee and in Madison with the engineers for the State of Wisconsin, a representative from the University, and Alex Barry and Art Littva of Vulcan's engineering department, in an effort to persuade the State to accept the C302 pipe. Mr. Littva then sent James Janke specifications and shop drawings showing use of the C302 pipe on the marine project and requested Janke to submit them under the "or equal" clause. The plans were submitted as requested, and were rejected by the State's project engineers as not approved.

In response to James Janke's inquiry as to why the pipe did not meet specifications, the engineers stated that the pipe was not AWWA C300 or C301 as specified; was not steel cylinder type; was not designed for an internal pressure of 50 psi; and did not have a beam strength equal to the pipe specified.

The engineers subsequently requested Janke to submit shop drawings using design conditions and materials as specified, stating that time was critical. Janke was then forced to buy the specified pipe from Interpace at a cost of $197,093.50, which was $39,942.40 [sic] over the $157,101.10 it would have paid for Vulcan's pipe in accordance with the latter's quotation.

The University of Wisconsin-Milwaukee project was first opened for bidding on May 21, 1969, but at that time it had to be bid on as an entire unit. Janke had bid as a subcontractor with a prime contractor on the marine portion, using Vulcan's prices in preparing its bid; however, there was a dispute at the time between the University and the City of Milwaukee as to whether the University should connect to the city's water system and, although the bids were opened, the contract was never awarded.

According to the normal bidding practices in the construction industry in the area, a contemplated project is generally listed or advertised in trade magazines and in the "Dodge Reports", a daily construction news service which lists proposed construction activity for various areas of the country. A subscriber to the "Dodge Reports" for a particular area may inspect the plans for a project in any Dodge plan room located in that area. The University of Wisconsin-Milwaukee project plans were available in Dodge plan rooms located in the Wisconsin cities of Milwaukee, Madison, Green Bay and Eau Clair. An interested mate-

rials supplier checks the plans and specifications to determine if he can supply any of the required materials. He then submits a quotation by telephone, mail, or both, to the contractors interested in bidding on the project. It is in this manner that contractors usually obtain quotations from competing suppliers and subcontractors. These quotations are then used by the contractors to estimate their own costs in preparing their bids. Normally, the twenty-four hour period preceding the prime bid deadline is one of great activity, with the subcontractors and suppliers making the rounds of the contractors who are still preparing their bids. By this time the first quotations have generally become known and the quoted prices are often revised downward at the last minute, with the prime contractors revising their bids accordingly.

The contractor usually purchases the materials from the supplier upon whose prices he relied in preparing his bid; however, a contract to purchase the materials is not entered into until after the contractor has been awarded the contract and the project engineers have approved the materials, if such approval is needed. The supplier then prepares the shop drawings for the project after the successful bidder signs a letter of intent to purchase the materials.

The Janke brothers testified that the supplier normally submits a price on material that will meet the specifications; however, Jerry Janke testified that if the supplier were offering non-specified material under the "or equal" clause he would, in the normal course of trade, alert the contractor to that fact so that the contractor, if he relied upon the quotation, would note on his bid that he proposed to supply substitute material under the "or equal" clause and that his bid is based on the substitute material. In this manner the contractor protects himself from having to perform on the bid, if it is accepted, in the event that the project engineers reject the non-specified (substitute) material as unsuitable.

Jerry Lapish, a marine contractor appearing for Vulcan, testified that when a quotation is received it is customarily the contractor's responsibility to check the specifications listed for the material on the quotation against the specifications listed in the project contract to determine for himself whether the supplier is offering non-specified material.

*Did the Court Err in Deciding the Case on the Theory of Promissory Estoppel?*

Vulcan first contends that the District Court erred in deciding the case on the theory of promissory estoppel in that Vulcan,—in reliance upon the statement of Janke's counsel at the pre-trial conference that Janke was trying the case on the contractual theories of express warranty and implied warranty of fitness for a particular purpose, and in further reliance upon the District Court's conclusion at said conference that only a narrow contractual issue was presented, —prepared, tried and briefed the action solely on said contract theories and was consequently prejudiced by being deprived of the opportunity, prior to judgment, to present a defense to the theory of promissory estoppel. We do not agree.

We concur with the District Court that the fact that Janke misconceived the legal theory of its case does not preclude it from obtaining relief under another legal theory. Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading which contains a claim for relief requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." As the court held in *Dotschay v. National Mutual Ins. Co.*, 246 F.2d 221, 223 (5th Cir. 1957):

> . . . It seems to us that the district court overlooked [in dismissing the complaint] our liberal rule of federal practice under which the complaint is not to be dismissed because the plaintiff's lawyer has misconceived the proper legal theory of the claim, but is sufficient if it shows that the

plaintiff is entitled to *any* relief which the court can grant, regardless of whether it asks for the proper relief.[1]

In *Hoffman v. Red Owl Stores, Inc.*, 26 Wis.2d 683, 696, 133 N.W.2d 267, 274 (1965), the Supreme Court of Wisconsin expressly adopted the doctrine of promissory estoppel. There the court found that defendants had promised to establish plaintiffs as franchise operators of one of their stores in a certain town if they would invest a specific amount of capital and fulfill other conditions. During a two-year period of negotiations, plaintiffs, relying upon defendants' promise, and in fulfillment of the conditions, sold their bakery and grocery businesses and a building, moved to another town, incurred moving expenses, made a down payment on a lot, and paid one month's rent on a home in the town where they had been led to believe that a franchised store would be available. Negotiations finally broke off after defendants demanded a larger capital investment than originally requested. The court found that the factual elements of promissory estoppel were present and concluded that injustice would result if plaintiffs were not granted some relief because of defendants' failure to keep their promises which induced plaintiffs to act to their detriment. The court stated:

> Because we deem the doctrine of promissory estoppel, as stated in sec. 90 of Restatement, 1 Contracts, is one which supplies a needed tool which courts may employ in a proper case to prevent injustice, we endorse and adopt it. 26 Wis.2d at 696, 133 N.W.2d at 274.

The *Hoffman* court held that a promise actionable under section 90 of the Restatement[2] need not have all the elements of an offer that would result in a binding contract between the parties if the promisee were to accept the same. Said the court:

> Originally the doctrine of promissory estoppel was invoked as a substitute for consideration rendering a gratuitous promise enforceable as a contract. See Williston, Contracts (1st ed.), p. 307, sec. 139. In other words, the acts of reliance by the promisee to his detriment provided a substitute for consideration. If promissory estoppel were to be limited to only those situations where the promise giving rise to the cause of action must be so definite with respect to all details that a contract would result were the promise supported by consideration, then the defendants' instant promises to Hoffman would not meet this test. However, sec. 90 of Restatement, 1 Contracts, does not impose the requirement that the promise giving rise to the cause of action must be so comprehensive in scope as to meet the requirements of an offer that would ripen into a contract if accepted by the promisee. Rather the conditions imposed are:
>
> (1) Was the promise one which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee?
>
> (2) Did the promise induce such action or forbearance?
>
> (3) Can injustice be avoided only by enforcement of the promise? [Footnote omitted.]
>
> We deem it would be a mistake to regard an action grounded on promissory estoppel as the equivalent of a breach of contract action.
>
> 26 Wis.2d at 697–98, 133 N.W.2d at 275.

Although *Hoffman* did not involve the applicability of the doctrine of promisso-

---

1. See also cases cited in *Dotschay, supra,* 246 F.2d at 223, n.5.

2. The doctrine of promissory estoppel is expressed in Section 90 of the Restatement of the Law of Contracts as follows:

> A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

ry estoppel to construction bidding cases, courts of other jurisdictions have applied the doctrine in such cases. For example, *Drennan v. Red Star Paving Company*, 51 Cal.2d 409, 333 P.2d 757 (1958), involved an oral bid by a subcontractor for certain work at a school project on which the plaintiff, the general contractor, was about to bid. Since defendant's bid was the lowest, plaintiff computed his own bid on the basis of defendant's bid price. Plaintiff was the successful bidder but was informed the next day by defendant that defendant would not do the work at its quoted price. The California Supreme Court applied the doctrine of promissory estoppel to prevent defendant's revocation of its bid, stating:

> . . . The very purpose of section 90 is to make a promise binding even though there was no consideration "in the sense of something that is bargained for and given in exchange." (See 1 Corbin, Contracts 634 et seq.) Reasonable reliance serves to hold the offeror in lieu of the consideration ordinarily required to make the offer binding.
>
> \*     \*     \*     \*     \*     \*
>
> When plaintiff used defendant's offer in computing his own bid, he bound himself to perform in reliance on defendant's terms. Though defendant did not bargain for this use of its bid neither did defendant make it idly, indifferent to whether it would be used or not. On the contrary it is reasonable to suppose that defendant submitted its bid to obtain the subcontract. It was bound to realize the substantial possibility that its bid would be the lowest, and that it would be included by plaintiff in his bid. It was to its own interest that the contractor be awarded the general contract; the

lower the subcontract bid, the lower the general contractor's bid was likely to be and the greater its chance of acceptance and hence the greater defendant's chance of getting the paving subcontract. Defendant had reason not only to expect plaintiff to rely on its bid but to want him to. Clearly defendant had a stake in plaintiff's reliance on its bid. Given this interest and the fact that plaintiff is bound by his own bid, it is only fair that plaintiff should have at least an opportunity to accept defendant's bid after the general contract has been awarded to him.

> It bears noting that a general contractor is not free to delay acceptance after he has been awarded the general contract in the hope of getting a better price. Nor can he reopen bargaining with the subcontractor and at the same time claim a continuing right to accept the original offer. . . .

333 P.2d at 760.

Likewise, in *Northwestern Engineering Co. v. Ellerman*, 69 S.D. 397, 10 N.W.2d 879 (1943), the court said, in applying the doctrine of promissory estoppel:

> . . . Obviously it would seem unjust and unfair, after appellant was declared the successful bidder and imposed with all the obligations of such, to allow respondents to then retract their promise and permit the effect of such retraction to fall upon the appellant. . . .

10 N.W.2d at 883.

Other cases in which the courts have applied the doctrine of promissory estoppel in construction bid cases are listed in the margin.[3]

■ After carefully examining the pleadings, we conclude that Janke's com-

---

**3.** *Debron Corporation v. National Homes Construction Corporation*, 493 F.2d 352 (8th Cir. 1974); *Constructors Supply Co. v. Bostrom Sheet Metal Works, Inc.*, 291 Minn. 113, 190 N.W.2d 71 (1971); *Saliba-Kringlen Corp. v. Allen Engineering Co.*, 15 Cal.App.3d 95, 92 Cal. Rptr. 799 (1971); *E. A. Coronis Associates v. M. Gordon Construction Co.*, 90 N.J.Super. 69, 216 A.2d 246 (1966); *Reynolds v. Texarkana Construction Co.*, 237 Ark. 583, 374 S.W.2d 818 (1964); *Norcross v. Winters*, 209 Cal. App.2d 207, 25 Cal.Rptr. 821 (1962); *Air Conditioning Co. of Hawaii v. Richards Construction Company*, 200 F.Supp. 167 (D.Hawaii, 1961), *affirmed on other grounds*, 318 F.2d 410 (9th Cir. 1963).

plaint set forth a claim upon which relief could be granted under a theory of promissory estoppel. We have examined the testimony of all of the witnesses with equal care and we conclude therefrom that the record fully supports the findings of the District Court, paraphrased as follows:

(1) Jerry Janke received a definite offer by telephone on March 5, 1970 from Vulcan to supply the concrete subaqueous pipe required for the University of Wisconsin-Milwaukee project at the quoted prices. At no time prior to the awarding of the contract was Janke informed that Vulcan was proposing to furnish anything other than the pipe specified in the project plans. Furthermore, throughout its course of dealing with the Janke brothers on this particular bid, Vulcan intentionally, and successfully, represented to Janke through its agents that it "would supply the pipe for the job", that is, the pipe specified in the project engineers' plans.

(2) The Janke brothers, not unreasonably, relied upon the representations of Vulcan's Wisconsin representative, Alex Barry, whom they knew from previous business dealings, and who continued to assure them up to the bid deadline that Vulcan could and would supply the required pipe. Accordingly, the Jankes, men of limited formal education and with no engineering or technical experience in, concrete subaqueous piping, were never alerted to the fact that they were relying upon a bid which was based on non-specified material. If they had known that Vulcan was offering pipe under the "or equal" clause, they would have conditioned their bid in like manner if they still wanted to use Vulcan's pipe.

(3) Janke acted with reasonable care and prudence in relying on Vulcan's offer, and this offer included, as represented to Janke, a proposal to furnish the specified concrete subaqueous pipe.

(4) Janke suffered substantial detriment by acting in reliance upon defendant's bid. It was compelled to go forward on the contract and supply the specified pipe when Vulcan's products were rejected as unsuitable. Upon Vulcan's refusal or inability to furnish the required material, Janke had to purchase the material from Interpace, the other pipe supplier, at a price which was $39,992.40 over Vulcan's bid.

(5) Vulcan's contention that Barry lacked authority to make representations on its behalf concerning its offer to supply Janke with pipe lacks credibility under the circumstances herein. Barry's actions, including his midnight call on the Janke brothers, his meeting with them the next day prior to the bid deadline, his last minute call to Vulcan to confirm its offer, and his participation in meetings with Janke and state representatives after the awarding of the contract in an attempt to obtain approval for use of Vulcan's C302 pipe, all belie Vulcan's disclaimers as to his agency status.

■ We thus agree with the District Court that Janke presented substantial evidence to support each of the elements of promissory estoppel, *viz.*, (1) defendant made a definite promise to plaintiff with the reasonable expectation that the promise would induce action of a definite and substantial character on the part of plaintiff; (2) that the promise induced such action; (3) that plaintiff acted in justifiable reliance upon the promise to its detriment; and (4) that injustice can be avoided only by enforcement of the promise.

■ In view of the foregoing, we conclude that the District Court correctly found that the facts which Janke had pleaded and relied upon to support its claim, and to which Vulcan responded in entering its defense, gave rise to the application of the doctrine of promissory estoppel. We hold accordingly that the District Court did not err in deciding the case on the theory of promissory estoppel.

*Was There Substantial Evidence To Support Recovery Upon a Theory of Promissory Estoppel?*

Vulcan next contends that there was no substantial evidence to support recovery upon a theory of promissory estoppel because: (1) there was no credible evidence that Vulcan promised to supply Janke specified materials; (2) there was no credible evidence that Janke acted in justifiable reliance upon any promise made by Vulcan; and (3) Janke failed to establish any reliance damages. Again we disagree.

The District Court found, in accordance with evidence amply supported by the record, that throughout the course of Vulcan's dealings with the Janke brothers, Vulcan intentionally and successfully represented to Janke, through Vulcan's agents, that Vulcan "would supply the pipe for the job", that is, pipe specified by the project engineers; that Alex Barry continued to assure the Janke brothers, up to the time they filed their bid, that Vulcan could and would supply the required pipe; that accordingly the Janke brothers, who were men of limited formal education and with no engineering or technical experience in concrete subaqueous piping, were never alerted to the fact that they were relying upon a bid based on non-specified material; and that the Janke brothers, had they known that Vulcan was offering non-specified pipe under the "or equal" clause, would have conditioned their bid in like manner if they still wanted to use Vulcan's non-specified pipe.

Janke did not supply Vulcan with the project plans and specifications. Therefore it is reasonable to infer that Vulcan obtained them either from the project engineers or through one of the Dodge Reports plan rooms prior to submitting, two weeks after the bidding, shop drawings and design specifications. The record does not indicate the date when Janke discovered that Vulcan was offering to supply non-specified pipe; however, between March 10 and March 23, 1970, Vulcan's representatives participated in a series of meetings with James Janke and the project engineers in an unsuccessful effort to persuade the engineers to accept Vulcan's non-specified C302 pipe. Finally, almost 7 weeks after the bidding, the project engineers requested Janke to submit shop drawings using material "as specified", and advised Janke that "Time is very critical to the completion of this project". Vulcan then realized that its pipe would not be accepted and, after two weeks of consideration as to whether Vulcan should go into the manufacture of steel-cylinder pipe to meet the specifications, decided not to try to furnish the pipe specified by the project engineers. It was then that Vulcan abandoned its efforts to supply Janke with pipe that would "do the job", although Vulcan's people had repeatedly assured Janke that its pipe would "do the job". Art Littva of Vulcan's engineering department then told James Janke to "go ahead and buy the pipe from Interpace".

We conclude that the record furnishes substantial and credible evidence that Vulcan promised to supply Janke with pipe which would be acceptable to the project engineers, and that Janke acted in justifiable reliance upon such promise.

As for Vulcan's argument that Janke failed to establish any reliance damages, we agree with the District Court that Janke suffered substantial detriment by acting in reliance upon Vulcan's bid; that upon Vulcan's finally telling Janke that Vulcan had decided not to go into manufacturing the specified pipe and that Janke should therefore go ahead and purchase the specified pipe from Interpace, Janke was compelled to pay Interpace $39,992.40 more than Vulcan had quoted. Janke was entitled to recover said amount in damages from Vulcan.

Vulcan argues, however, that when Janke received Vulcan's written confirmation on or about March 11th, Janke was put on written notice that Vulcan's quoted prices were on C302 Class III pipe and that Janke could then have notified the State of its error,—if an error was made,—and could have rescinded its bid within 72 hours of the bid opening.

The weakness of this argument is that Janke was relying on Vulcan to produce proper pipe for the project—pipe that assuredly would "do the job"—and that it was not until March 27th, long past the time when Janke could have rescinded its bid, that Janke was advised that Vulcan's C302 pipe was not acceptable.

In view of all of the foregoing, the judgment of the District Court is Affirmed.